IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 4, 2022

## IN RE CORA W.

**Appeal from the Juvenile Court for Macon County**
**No. 2021-JV-26      Ken Witcher, Judge**

_____

### No. M2021-00804-COA-R3-PT

_____

This appeal concerns the termination of parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Macon County ("the Juvenile Court") seeking to terminate the parental rights of Zackery B. ("Father") and Anna H. ("Mother") to their minor child Cora W. ("the Child"). After a trial, the Juvenile Court entered an order finding by clear and convincing evidence that the grounds of wanton disregard and severe child abuse were proven against both parents. The Juvenile Court found further, also by clear and convincing evidence, that termination of Mother's and Father's parental rights is in the Child's best interest. Mother and Father appeal. Among other things, both parents argue that their pre-incarceration conduct was not part of a broader pattern sufficient to sustain the ground of wanton disregard. Neither parent disputes the ground of severe child abuse, which was based upon the Child's massive exposure to drugs including methamphetamine. We affirm the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

Michael J. Rocco, Sparta, Tennessee, for the appellant, Zackery B.

Kara Bellar, Carthage, Tennessee, for the appellant, Anna H.

Herbert H. Slatery, III, Attorney General and Reporter, and Lexie A. Ward, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

The Child was born in June 2020. On August 10, 2020, DCS received a referral alleging child drug exposure. On August 7, 2020, law enforcement had searched Mother and Father's home and found 1.8 ounces of a crystal substance in the bedroom inches away from the Child's bottle. The substance tested positive for methamphetamine and fentanyl. The bedroom contained firearms, pipes, rolling paper, a plastic bag with white residue, and certain unidentified pills not prescribed to Mother or Father. On August 11, 2020, the Child entered DCS custody pursuant to a protective custody order. On August 12, 2020, the Child tested positive for the following drugs at the following levels: 6,425 pg/mg of amphetamine; 50,500 pg/mg of methamphetamine; 653 pg/mg of hydrocodone; and 1000 pg/mg of oxycodone. On September 21, 2020, the Juvenile Court adjudicated the Child dependent and neglected, as well as a victim of severe child abuse perpetrated by Mother and Father. Neither parent appealed this order. Mother and Father were charged with a litany of drug-related criminal offenses.

Permanency plans were developed for Mother and Father on September 17, 2020 and March 25, 2021. Mother's and Father's responsibilities included: stop using alcohol and illegal or non-prescribed medications; submit to random drug screens; demonstrate sobriety for a minimum of three months in a non-controlled environment; complete an alcohol and drug assessment and complete recommendations; refrain from incurring new legal charges and resolve pending charges; refrain from associating with known drug users or anyone involved in criminal activity; obtain a parenting assessment and follow recommendations; provide proof of housing, including rent and utility receipts; pay child support as ordered or voluntarily; and establish a legal means of financial support and provide proof of this to DCS. Under the second plan, Mother's responsibilities remained the same. Father's responsibilities on the second plan were modified to reflect his completion of two assessments. On February 9, 2021, DCS filed its petition seeking to terminate Mother's and Father's parental rights to the Child. DCS alleged the grounds of abandonment by wanton disregard and severe child abuse against both parents.

In June 2021, the Juvenile Court heard DCS's termination petition. First to testify was Joe O. ("Foster Father"), the Child's foster father. The Child had lived in Foster Father's home since August 2020. Foster Father's wife, Rose, and the Child's then 14-year-old half-brother, A.H, also lived in the home. Foster Father had been married to his wife for nearly 24 years. As to the foster parents' jobs, Foster Father was a quality assurance manager and his wife was a quality/production supervisor. Foster Father

testified he was able to support the Child and was willing to adopt her. Foster Father stated that the Child was "happy and thriving" in his care. Foster Father testified to the concerns he would have if the Child were placed back in the care of Mother or Father:

> I don't know [Father]. I've never met [Father] in my life, okay? I can't speak to that. I know what charges he's facing currently. As far as [Mother], I met [Mother] when she was 11 years old when her mother and I got married.
> I don't know how to approach this exactly, she's, being a mother is not the highest priority in her life. She might not agree with that but it's evident by her actions. Her 15-year-old son, who lives with us now, she lost custody of him when he was five years old because of drugs, also.

Foster Father testified that A.H. was affectionate toward the Child but was not very interested in her given the age gap between them. Foster Father expanded on how A.H. came to live with him: "[H]e's not in our custody. His father has custody. He prefers to live with us. Again, this is -- our home is really the only true home he's ever known. That's what -- he calls our house home, he always has." Foster Father stated that he and his wife were very much bonded with the Child. Foster Father testified: "The child has stole my heart completely…."

On cross-examination by Mother's counsel, Foster Father was asked about Mother's visitation. Foster Father stated: "Nothing in person. She calls the home, typically, I'd say five to six days -- nights a week, probably. I think she's changed to calling in the mornings now, sometimes … I'm not sure why that is. And she also does a video call, probably, once a week, maybe twice a week." Asked if this showed that Mother was making efforts to stay bonded with the Child, Foster Father testified:

> She, well, she, she calls the home, yes, but it's not just to talk to [the Child]. I'm sure it is to talk to [the Child] possibly, but she also calls to talk to her son, she also calls to talk to her mother. [The Child] actually doesn't recognize [Mother]. She was taken from her when she was seven weeks old. There's no bond there.

On cross-examination by Father's counsel, Foster Father was asked about Father's contact with the Child. Foster Father stated:

> Not as often as [Mother]. He -- I'm, I'm -- the video call, maybe once a week. There was a period where he didn't call at all for some time. I'm not sure what was going on there. I think he told my wife he was depressed

for a while or something, he didn't call for a while, as far as video calls or, or other phone calls, for that matter.

He, he started out calling originally, maybe, four or five times a week, I would think, and maybe video called once a week and it just declined over time. But he, he still has made an effort to contact her throughout the time he's been in jail, just less than it originally started.

Next to testify was Rebecca Medeiros ("Medeiros"), who worked on DCS's drug exposure investigation team. Medeiros received a referral concerning the Child's drug exposure. DCS had a prior history with Mother dating back to 2011 and allegations of drug exposure regarding her son, A.H. The specific allegations against Mother then were "drug exposure, as well, specifically methamphetamine. She had made an admission during that case to using." In the present case, "[the Child's] hair follicle came back for very high levels of methamphetamine, as well as various opiates." Medeiros testified: "[L]aw enforcement had found a significant amount of methamphetamine that had been laced with fentanyl in the home, as well as weapons. Some other paraphernalia was also found." The parents' criminal charges were still pending as of the last time Medeiros had checked and were set to be heard that August.

Lindsay Kenyon ("Kenyon"), DCS family service worker, was the last witness to testify. Kenyon had worked on the Child's case since its inception. Kenyon testified to the difficulty in providing services to Mother and Father while they were incarcerated:

Well, it's really hard to provide services to incarcerated parents. It's really hard to monitor any type of sobriety, because we like to see that in an uncontrolled environment, and jail is considered a controlled environment. So, it really limits our services and what we can do to help parents when they're in jail.

Nevertheless, DCS was able to work some services. Kenyon explained:

[W]e were able to put in for parenting, an "A" and "D", and mental health assessments for the parents. We tried to find a way to do it so that the Department could pay and then maybe we tried to use [the Child's] insurance so, for another parent so we were able to try to provide those service[s].

Father completed his assessments. The recommendations from Father's assessments were "[i]ntensive outpatient drug treatment and parenting education." However, Father could not complete these recommendations while he was in jail. As for Mother, Kenyon testified that "whenever it got time to do the assessment, she did not want to do it because she felt her mental health would be different on the outside of jail than it

was on the inside. So, she was not able to complete that." Kenyon could not predict when the parents would be released from jail. Kenyon stated that "the child does deserve permanency no matter what's going to happen as far as parents' incarceration."

Regarding whether the Child had suffered any ill effects from the drug exposure, Kenyon testified: "I just know the substances that she was positive for on her hair test. She's been super lucky as far as any type of medical treatment that she's got. She's had no delays and she's done really well." Kenyon stated that the Child may have to be re-evaluated in the future to determine if she has any medical conditions such as ADHD or behavioral problems. As for whether the parents had any physical contact with the Child since they were incarcerated, Kenyon stated that the parents were able to hold the Child at the very first Child and Family Team meeting, but not since then. Kenyon testified that changing the Child's environment at this point would "traumatize her tremendously." Kenyon explained:

> Because, I mean, the [foster family members] are her people. I mean, they, she looks to them for nurturing, for guidance. When she's scared or afraid, she will reach for them. If she, you know, they're the ones that care for her, and she's, when she's not, unsure about something and she's confused, you know, she wants her poppa, and it's just the way it is.

Kenyon stated that she observed the foster parents with the Child and saw "[l]ots of love" there. Kenyon testified that "[the Child] has everything that she needs and more. She has her room, a crib, toys, food, anything that she needs or wants." Kenyon stated it was her understanding that the parents had paid no child support, but she also acknowledged they were incarcerated. In Kenyon's view, termination of Mother's and Father's parental rights is in the Child's best interest.

On cross-examination by Mother's counsel, Kenyon stated that Mother had not made an adjustment of circumstances based on the fact Mother had lost custody of her son, which occurred under circumstances similar to those of the present case. Father's counsel asked Kenyon a series of questions regarding areas of Father's cooperation with DCS. Kenyon acknowledged that Father engaged in video calls with the Child; that he had done everything he could do on the case while in jail; and that he had never shown any resistance to DCS about working services in the future once he got out of jail.

In July 2021, the Juvenile Court entered an order terminating Mother's and Father's parental rights to the Child. The Juvenile Court found that two grounds were proven against both Mother and Father by the standard of clear and convincing evidence: (1) wanton disregard and (2) severe child abuse. The Juvenile Court also found by the standard of clear and convincing evidence that termination of Mother's and Father's parental rights

is in the Child's best interest. In its order, the Juvenile Court found as follows, in relevant part:

Upon the petition, the evidence presented, arguments of counsel, exhibits and the entire record, the Court finds by clear and convincing evidence that the Petition to Terminate Parental Rights of the Respondents, [Mother and Father], as filed by the Tennessee Department of Children's Services, is well taken and should be GRANTED and relief granted thereunder.

The Court found all of the State's witnesses to be credible. Their credibility has not been challenged in any way, and their testimony has not been disputed. The Court makes factual findings in accordance with the testimony of all the witnesses here today.

The Court finds that the State of Tennessee, Department of Children's Services has proven by clear and convincing evidence that grounds for termination of parental rights exist based upon the following findings of fact.

The Court will also state, from a factual finding, that all of the exhibits that have been introduced here today have been accepted by the Court and incorporated as findings of fact in this Order.

### *Abandonment by Wanton Disregard*

1. The first ground that the State has alleged is the ground of abandonment by wanton disregard and that is located under Tenn. Code Ann. § 36-1-113(g)(1).
2. The Court is also required to look at the definition of abandonment, and the specific part of the definition is Tenn. Cod[e] Ann. § 36-1-102(1)(A)(iv), and this starts out with the statement, 'A parent that is incarcerated at the time of the institution of the action to declare the child to be abandoned.'
3. The Court finds that the petition to terminate parental rights was filed on February 9, 2021.
4. Both parents were in jail on February 9, 2021, and both parents have been incarcerated continuously since August 6, 2020.
5. Therefore, it is established that the parents were incarcerated at the time the petition was filed.
6. The next thing the Court looks at is the part of the definition that states, 'Or the parents have engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.'
7. This is part of the definition that the State has alleged in its petition.
8. The Court finds that the State has established this ground.

-6-

9. The conduct that the parents engaged in prior to their incarceration was that the parents engaged in drug use, and exposed their child to these drugs to the extent that the child had drugs in her own system.

10. This child tested for high levels of drugs in her system.

11. These parents have been charged criminally regarding those activities.

12. The record clearly shows that this child was exposed [to] drugs while in the home of the parents, and that certainly constitutes a wanton disregard for the welfare of the child.

13. Therefore, the Court finds that [Father and Mother] have abandoned the child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. [Code Ann.] 36-1-102(1)(A)(iv) and therefore their parental rights should be terminated.

### *Severe Child Abuse*

14. The second ground alleged in the State's petition is the ground of severe child abuse.

15. This is defined in Tenn. Code Ann. § 37-1-113(g)(4).

16. The Court finds that this ground has been clearly established by clear and convincing evidence.

17. The State has introduced as its exhibit a judgement showing that on September 21, 2020, that the Court found that this child is a victim of severe child abuse perpetrated by the parents based upon their exposure of the child to drugs.

18. The documentary evidence clearly establishes this ground.

19. Therefore, their parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(4).

## BEST INTERESTS

The Court finds that the State of Tennessee, Department of Children's Services has proven by clear and convincing evidence that termination of parental rights is in the best interest of the children based upon the following findings of fact.

20. Whether or not the parents have made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be at the home with the parent: The Court finds that this factor weighs in favor of termination because these parents do not have a home that the child can go to now. Both parents remain incarcerated.

21. Whether or not the parents have failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such a duration

of time that lasting adjustment does not appear reasonably possible: The Court finds that this factor weighs in favor of termination. These parents have not made any adjustments. They are both in jail. The Department of Children's Services, the Court will find, has offered the services that they were able to offer, which were basically the assessments that Ms. Kenyon testified here to today. However, neither of the parents have fulfilled any of the requirements of the permanency plan that they would need to fulfill to make adjustments for their child.

22. Whether or not the parent has maintained regular visitation or other contact with the child: The Court finds that this factor weighs in favor of termination. These parents have not visited the child, even though the proof has shown that they have had contact with the child through video and phone calls. However, the reason they have not been able to personally visit the child is due to their own conduct of committing activities that caused them to be in jail. The Court finds that they are the ones that put themselves in jail and this reason is why they have not been able to maintain regular visitation.

23. Whether or not there is a meaningful relationship established between the parent and the child: The Court finds that this factor weighs in favor of the State. The Court finds that there is no meaningful relationship between the child and either one of these parents. This is due again to the parents' conduct causing them to be put in jail.

24. Whether or not the effect of a change in caretakers for this child and physical environment of this child would likely have a negative [e]ffect on her emotional, psychological, and medical condition: The Court finds that this factor weighs in favor of termination. This is a very strong factor in finding that termination is in the child's best interest. The Court finds that the child is in a very good and loving home that has provided for all of the child's needs. The child is bonded with the foster parents, and the Court finds that it would have a very detrimental effect on the child's emotional, psychological, and medical condition to remove her from this foster home which is the only home she has ever lived [in] since removal.

25. Whether or not the parent has shown brutality, physical, sexual, emotional abuse towards the child: The Court finds that this factor weighs in favor of finding best interest to terminate. These parents have been found guilty already of committing severe child abuse against this child by exposing the child to drugs.

26. Whether or not the physical environment of the parent's home is healthy and safe, whether or not there is criminal activity in the home, and whether or not there is use of alcohol and controlled substances that would render the parent consistently unable to care for the child: The Court finds that this weighs in favor of termination. The parents do not have a home for the child

to return back to since both parents are currently in jail.  They are in jail due to criminal activity due to use of controlled substances.

27. Whether or not the parent's mental or emotional status would be detrimental to the child or prevent the parent effectively providing safe and stable care and supervision for the child: The Court finds that this factor weighs in favor of the State. The parents have not received any kind of counseling or treatment. The father, particularly, has had an assessment in which he has been recommended some treatment and he has not obtained that treatment.  As to the mother, there has been no proof that she has received any type of treatment.

28. Whether or not the parents have paid child support: The Court makes a finding that neither parent has paid child support.  This is because they are in jail, and they are in jail because of their own actions.  This factor weights in favor of termination in the best interest analysis.

Thus the Court finds that the Tennessee Department of Children's Services has proven by clear and convincing evidence that grounds for termination of parental rights exist and has proven by clear and convincing evidence that it is in the best interest of the child that all the parental rights of [Mother and Father] to [the Child] be forever terminated; and therefore the complete custody and guardianship of said child be awarded to the State of Tennessee, Department of Children's Services, with the right to place said child for adoption and to consent to said adoption in loco parentis.

Mother and Father timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Father raises the following issues on appeal: 1) whether the Juvenile Court erred in finding the ground of wanton disregard and 2) whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Child's best interest.  For her part, Mother raises the following issues, as restated slightly: 1) whether the Juvenile Court erred in finding grounds for termination against Mother and 2) whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by

the Due Process Clauses of the federal and state constitutions.[1]  *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993).  But parental rights, although fundamental and constitutionally protected, are not absolute.  *In re Angela E.*, 303 S.W.3d at 250.  "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .'  Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child."  *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.  "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it."  *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388.  "Few consequences of judicial action are so grave as the severance of natural family ties."  *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996).  The parental rights at stake are "far more precious than any property right."  *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child."  Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable").  In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence.  *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388.  This standard minimizes the risk of unnecessary or erroneous governmental interference

---

[1] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .").  Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[2] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[3] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause

---

[2] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[3] Tenn. Code Ann. § 36-1-113(i).

substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion

of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

While Mother's issue regarding grounds for termination uses the plural term "grounds," she in fact only specifically argues against the ground of wanton disregard. As to Father, he states in his brief that he has "not appealed the trial court's finding of severe abuse, as such finding was based on a certified adjudication order of the Juvenile Court from the dependency and neglect petition; which was a final order at the time of the termination hearing." Nevertheless, the Tennessee Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (internal citation and footnote omitted). Therefore, we will review each of the grounds found against Mother and Father.

When DCS filed its petition on February 9, 2021, the relevant grounds for termination of parental rights were set out by statute as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
>
> ***
>
> (4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g) (1), (4) (West March 6, 2020 to April 21, 2021).

-13-

The type of abandonment at issue on appeal is commonly referred to as wanton disregard, defined thusly:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

\*\*\*

(iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

\*\*\*

(*c*) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. §36-1-102(1)(A)(iv) (West March 6, 2020 to June 30, 2021).

Beginning with those issues pertaining to Father, we first address whether the Juvenile Court erred in finding the ground of severe child abuse. We have previously determined that a prior finding by a juvenile court in dependency and neglect proceedings can be *res judicata* in parental rights termination proceedings. *See In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). In those cases, the doctrine of *res judicata* prevents the issue from being re-litigated in the subsequent parental rights termination proceeding. *Id.* In September 2020, the Juvenile Court entered its Adjudication and Final Disposition Hearing Order in which it adjudicated the Child dependent and neglected. Father, the Child, and DCS all were parties to this action. The Juvenile Court found further that the Child was a victim of severe child abuse perpetrated by Father as defined at Tenn. Code Ann. § 37-1-102. The severe child abuse finding was based upon the Child's exposure to drugs. Father did not appeal this order. *Res judicata* applies. We find, as did the Juvenile Court, that the ground of severe child abuse was proven against Father by the standard of clear and convincing evidence.

Continuing with Father's issues, we next address whether the Juvenile Court erred in finding the ground of wanton disregard. Father makes several arguments as to this issue: that the Juvenile Court wrongly considered criminal charges incurred by Father between

-14-

August 10, 2019 and August 26, 2019, which took place before the Child's June 2020 birth (and even before her conception); that Father's other criminal charges all stemmed from his arrest on August 6, 2020; that the Child's drug exposure, while extremely serious, was a one-time incident insufficient to sustain the ground of wanton disregard; and finally, that Father's other behavior shows he had no intention of abandoning the Child, as demonstrated through, for instance, his completion of alcohol and drug assessments, parenting classes, and mental health assessments, as well as through his maintaining contact with the Child through video calls.

In *In re Audrey S.*, this Court elaborated upon what sort of conduct constitutes wanton disregard:

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

> ***

> We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child.

*In re Audrey S.*, 182 S.W.3d 838, 866-68 (Tenn. Ct. App. 2005) (internal citations and footnote omitted). In dicta, this Court has recognized a scenario could arise where a parent's one-time conduct is so egregious that the one-time conduct in itself might

-15-

constitute abandonment of a child by wanton disregard for the child's welfare. *In re Trinity H.*, No. M2020-00440-COA-R3-PT, 2020 WL 5110312, at *10 (Tenn. Ct. App. Aug. 28, 2020), *no appl. perm. appeal filed*. Father argues that "the one-time conduct test is a significant departure from this court's previous jurisprudence." In view of Father's effective concession as to the other ground found against him, the crux of his argument appears to be that while he severely abused the Child by exposing her to drugs he did not *abandon* the Child by exhibiting wanton disregard for her welfare.

We agree with Father that his conduct prior to his awareness of even the possibility of the Child's existence cannot be used against him to support the ground of wanton disregard. However, there is no hint from the Juvenile Court's order that it based its findings on that particular conduct of Father's. Rather, the Juvenile Court based its findings on the Child's exposure to drugs at Father's hands. The Juvenile Court's findings with regard to this ground culminate with a finding that "[t]he record clearly shows that this child was exposed [to] drugs while in the home of the parents, and that certainly constitutes a wanton disregard for the welfare of the child." The conduct referred to by the Juvenile Court occurred during the Child's lifetime while she was in Father's care while in Father's home.

We find unpersuasive Father's argument that his massively exposing the Child to dangerous drugs cannot, in itself, sustain the ground of wanton disregard. As this Court stated in *In re Audrey S.*, "[w]e have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, <u>alone</u> or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." 182 S.W.3d at 867-68 (internal citations omitted, emphasis added).[4] It was not necessary that Father massively expose the Child to dangerous drugs in the manner he did multiple times in order for the ground of wanton disregard to become applicable; the Child's one wholly unjustified brush with severe injury or death at the hands of Father was enough. While Father argues he did not intend to forego his parenting responsibilities by massively exposing the Child to dangerous drugs, it was imminently foreseeable that in so doing he risked severely injuring or killing the Child. Father's subsequent compliance with DCS services is commendable but does not undo his massively exposing the Child to dangerous drugs.

What is more, it is not accurate to refer to the Child's massive exposure to dangerous drugs as "one-time conduct" on Father's part. To be sure, Father's being caught was a singular event. However, being caught was not the basis for Father's wanton disregard; rather it was his keeping dangerous drugs in his home to the point the Child was massively

---

[4] While any one or more of these types of conduct can constitute wanton disregard, parental incarceration is not a default basis for finding the ground.

exposed to these drugs that constitutes wanton disregard. This ongoing state of affairs was interrupted only by the intervention of law enforcement. The evidence does not preponderate against the Juvenile Court's findings relative to this ground. We find, as did the Juvenile Court, that the ground of abandonment by wanton disregard was proven against Father by clear and convincing evidence.

The last issue pertaining to Father is whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Child's best interest. At the time DCS filed its petition, the statutory best interest factors read as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (West March 6, 2020 to April 21, 2021).

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering

all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Father concedes that best interest factors (6) and (7) favor termination of his parental rights, but argues that the other factors are neutral or weigh in favor of preserving his parental rights. Father states that his being incarcerated prevented him from doing certain things like paying child support as he was without means. All in all, Father argues the balance of the best interest factors favor preserving his parental rights. We agree that Father deserves credit in certain areas. For example, Father completed his assessments; maintained a certain level of contact with the Child; and was relatively cooperative with DCS. Father was unable to complete the recommendations from his assessments because he was incarcerated, but he did what he could do in terms of services.

However, as Father concedes and as found by the Juvenile Court, best interest factors (6) and (7)—those concerning abuse toward a child and the environment of a parent's home, respectively—weigh in favor of termination. The evidence does not preponderate against these findings made by the Juvenile Court. While all best interest factors must be considered, any one or two best interest factors may have outcome-determinative weight. Here, Father severely abused the Child by massively exposing her to dangerous drugs. Father's previous home was riddled with drugs, and he has no home for the Child at present. In contrast, the Child is thriving in her foster home with a family willing to adopt her. The testimony from trial reflects that the Child would be "traumatize[d]" were she to be removed from her foster family. There is no evidence that the Child has a comparable relationship with Father. Meanwhile, Father has pending criminal charges, and it is uncertain when he could even begin to be in a position to safely parent the Child. In view of these facts, keeping the Child in limbo would not inure to her best interest. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Father's parental rights is in the Child's best interest.

Turning now to Mother's issues, we address whether the Juvenile Court erred in finding the ground of severe child abuse against Mother. In September 2020, the Juvenile Court entered an order in which it found the Child was a victim of severe child abuse, perpetrated by Mother, as defined at Tenn. Code Ann. § 37-1-102. Mother, the Child, and DCS all were parties to this action. Mother did not appeal this order; the matter of severe child abuse has been fully litigated. *Res judicata* applies. We find, as did the Juvenile

Court, that the ground of severe child abuse was proven against Mother by the standard of clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of wanton disregard against Mother. Mother argues this ground should be reversed because there was no proof of a broader pattern of her pre-incarceration conduct. We disagree. First, we reject an interpretation of the statute and associated caselaw that would require a parent to massively expose her child to dangerous drugs more than once before that behavior could fit the definition of abandonment by wanton disregard. Such interpretation is strained and unreasonable. Second, it is not even accurate to describe Mother's conduct in exposing the Child to drugs as a singular event as opposed to being part of a pattern. The Child was exposed to drugs while in Mother's care while in Mother's drug-riddled home—a condition, not a one-time event. This was an existing state of affairs interrupted only by the intervention of authorities. The evidence does not preponderate against the Juvenile Court's findings relative to this issue. We find, as did the Juvenile Court, that the ground of abandonment by wanton disregard was proven against Mother by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Child's best interest. Mother concedes factor (6) concerning child abuse, but contends the other factors are neutral or weigh in favor of preserving her parental rights. Mother argues that because of her incarceration she was hampered from completing services, establishing a safe home, or paying child support. Mother also argues she was not given enough time to make an adjustment of circumstances.

To Mother's credit, she maintained contact with the Child. However, the evidence shows that the Child does not recognize Mother, suggesting theirs is not a closely bonded relationship. We recognize further that Mother's incarceration prevented her from completing all of her necessary services. However, the evidence shows that Mother refused to participate in assessments—something within her ability to do— "because she felt her mental health would be different on the outside of jail…." Furthermore, while it is reasonable to consider the limitations imposed by incarceration when assessing a parent's efforts in a parental rights termination case, simply saying "I was incarcerated" is neither a cure-all excuse nor dispositive as to what is in a child's best interest. Mother was indeed incarcerated because of her own actions, and it is unknown when she will be released. In the meantime, the Child is thriving in her foster home with a family willing to adopt her. The evidence reflects that the Child is closely bonded with her foster family, and she would be "traumatize[d]" were she to be removed from it.

-20-

The Juvenile Court found, among other things, that removing the Child from her foster family would have a very detrimental effect on her. The Juvenile Court found further that Mother severely abused the Child, and Mother has no home for the Child at present. The evidence does not preponderate against these findings made by the Juvenile Court. The Child deserves permanency and stability; regrettably, nothing in this record suggests she can attain either with Mother any time in the near future. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Child's best interest.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed one-half against the Appellant, Zackery B., and his surety, if any, and one-half against the Appellant, Anna H., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE